## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

BIGFOOT 4x4, INC.,      )

Plaintiff,      )

vs.      )     Case No. 1:22-CV-06758

THE INDIVIDUALS,      )     Magistrate Judge Jeffrey T. Gilbert
CORPORATIONS, LIMITED      )
LIABILITY COMPANIES,      )
PARTNERSHIPS, and      )
UNINCORPORATED      )
ASSOCIATIONS IDENTIFIED ON      )
SCHEDULE A HERETO,      )
Defendants.      )

### MEMORANDUM OPINION AND ORDER

Defendants Shenzhen Daeon Model Technology Co., Ltd., Shenzhen Aoxinfa Technology Co., Ltd., and Shenzhen Tianqinli Technology Co., Ltd. (collectively, the "Daeon Defendants") seek to compel production of documents from Plaintiff Bigfoot 4x4, Inc. ("Plaintiff"). *See* Daeon Defendants' Opposed Motion to Compel Production of Documents and Award Fees and Costs [ECF No. 160]. The Daeon Defendants seek to compel production of (1) agreements related to the asserted trademarks, including litigation settlements and licensing agreements; (2) Plaintiff's communications with Amazon about the Daeon Defendants; and (3) all documents related to New Alchemy, a company that Plaintiff works with in its efforts to protect its trademarks. *See* Memorandum in Support of Motion to Compel [ECF No. 161] ("Motion") at 3-6.[1] The

---

[1] Fact discovery closed as of October 31, 2023. [ECF No. 144]; [ECF No. 158]. The Daeon Defendants argue that they attempted to resolve these disputes with Plaintiff during the discovery period, but were unable to do so. Plaintiff served amended responses to the Daeon

Daeon Defendants also seek an award of their fees and expenses in bringing this Motion pursuant to Federal Rule of Civil Procedure 37(a)(5). [*Id.*]

Federal Rule of Civil Procedure 26(b)(1) states "[p]arties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit." FED. R. CIV. P. 26(b)(1). District courts have broad discretion when ruling on discovery-related issues. *See Peals v. Terre Haute Police Dep't*, 535 F.3d 621, 629 (7th Cir. 2008); *see also* FED. R. CIV. P. 37(a).

## I. Analysis

### A. Plaintiff's Settlement And Licensing Agreements Related To The Asserted Trademarks.

Plaintiff argues the Daeon Defendants' requests for "all documents" related to Plaintiff's settlements and licensing of the trademarks at issue, and all agreements related to those trademarks, are facially overbroad. Plaintiff's Response to Motion [ECF No. 164] ("Response") at 5-7. Request for Production No. 37 seeks "[a]ll documents concerning settlement, judgment, or other resolution" related to Plaintiff's asserted trademarks; Request for Production No. 46 seeks "all agreements . . . involving the Asserted Trademarks;" and Request for Production No. 47 seeks "[a]ll

---

Defendants' requests for production on October 31, 2023, but did not supplement its document production. [ECF No. 161] at 2. The Daeon Defendants filed this Motion on November 17, 2023.

documents concerning Plaintiff's licensing" of the asserted trademarks. *See* Motion [ECF No. 161] at 3.

The Court agrees the requests as written are overbroad but that is not necessarily the end of the matter. The Daeon Defendants now seek a narrower category of documents, limited to "litigation settlements and licensing agreements" that are "related to the asserted trademarks." Motion [ECF No. 161] at 3; Reply in Support of Daeon Defendants' Motion [ECF No. 166] ("Reply") at 2. The Daeon Defendants say both settlement and licensing agreements related to the asserted trademarks potentially are relevant to Plaintiff's claim for damages for trademark infringement. Motion [ECF No. 161] at 3-4; Reply [ECF No. 166] at 2.[2]

Plaintiff first says it should not be required to produce its settlement agreements with other defendants given the confidentiality provisions in those agreements. Response [ECF No. 164] at 7-8. While the Court agrees with the Daeon Defendants that such confidentiality provisions do not immunize settlement agreements from discovery, particularly where licensing or royalty terms could be relevant to damages, [ECF No. 166] at 3, that does not mean confidentiality does not serve an important goal in promoting the settlement of litigation. *See Grove Fresh Distributors, Inc. v. John Labatt Ltd.*, 888 F. Supp. 1427, 1441 (N.D. Ill. 1995), *aff'd*,

---

[2] Although the Daeon Defendants also say they are seeking production of all of Plaintiff's "agreements related to its asserted trademarks," which presumably could include documents other than settlement or licensing agreements, Defendants only address the relevance of licensing agreements and settlement agreements to assessing damages. Both parties also focus their briefing on the question of whether settlement and licensing agreements should be produced. Accordingly, the Court construes the Defendants' Motion to seek production of settlement and licensing agreements related to the asserted trademarks, rather than any broader category of agreements that was not addressed by the parties.

134 F.3d 374 (7th Cir. 1998) ("confidential settlement agreements are likely in the long run to best serve the interests of the public and the parties alike: '[W]hatever the value of disclosure, it should not obscure the strong public interest in, and policy objectives furthered by, promoting settlement.' *Id.* at 486. Thus, 'absent special circumstances, a court should honor confidentialities that are bargained-for elements of settlement agreements.'") (quoting Arthur R. Miller, *Confidentiality, Protective Orders, and Public Access to the Courts,* 105 Harv.L.Rev. 427, 486–87 (1991)).[3]

Therefore, "[w]hether a confidential settlement agreement should be disclosed to other parties in a multi-party case is governed by the familiar Rule 26(b)(1) discovery standards. . . . While there is no settlement privilege to overcome, in most cases, the movant articulates a specific basis as to why the settlement terms are relevant to a claim or defense in the continuing litigation so that production of the settlement agreement is proportional to the needs of the case and overrides the settling parties' interest in keeping their settlement confidential." *In re Dealer Mgmt. Sys. Antitrust Litig.*, 2019 WL 3884036, at *2 (N.D. Ill. Aug. 16, 2019). Here, the Daeon Defendants contend Plaintiff's settlement agreements are relevant to a

---

[3] Plaintiff's other cited cases do not weigh the relevance of settlement agreements against the interest in confidentiality. *See Homeland Ins. Co. of New York v. Health Care Serv. Corp.*, 330 F.R.D. 180, 182–83 (N.D. Ill. 2019) (plaintiff's request for settlement agreement to evaluate merits of policy exhaustion defense was "premature" where "sole theory of relevance is that the settlement agreement may refute HCSC's exhaustion argument or otherwise give rise to a coverage defense" but the defendant had not yet made a claim under the insurance policies at issue; "mere speculation that the settlement agreement might someday be relevant does not warrant overriding the interests inherent in the settling parties' decision to keep the agreement's terms confidential"); *Butta-Brinkman v. FCA Int'l, Ltd.*, 164 F.R.D. 475, 476–77 (N.D. Ill. 1995) (denying plaintiff's motion to compel production of confidential settlement agreements reached with other employees in sexual harassment cases based on "the strong congressional policy favoring settlement" and where "the information is available through other means".

trademark infringement damages calculation based on a reasonable royalty. Motion [ECF No. 161] at 3; Reply [ECF No. 166] at 3.

Plaintiff disputes the relevance of settlement agreements, citing *Luxottica Grp. S.p.A. v. Yiwu Cujia Trade Co.*, but that case simply is not on point. Response [ECF No. 164] at 8. In that case, the plaintiff sought to obtain the defendant's documents from other trademark litigation involving different plaintiffs and product lines than were involved in the litigation at hand. Here, the Daoen Defendants' request is for Plaintiff's settlement agreements involving the same trademarks at issue in this case, including between Plaintiff and other defendants in this litigation. *Id.*, 2023 WL 6520213, at *3–4 (N.D. Ill. Oct. 5, 2023). The court in *Luxottica Group.* also did not address whether or under what circumstances settlement agreements were relevant to a plaintiff's calculation of trademark damages.

The Daeon Defendants do not cite cases directly addressing the relevance of settlement agreements in their Motion, but in their Reply, Defendants cite *M2M Sols. LLC v. Sierra Wireless Am., Inc.,* which does address settlement agreements. That decision, however, is only tangentially applicable to the discovery issue in this case since it dealt primarily with the admissibility of expert testimony analyzing royalty terms in a settlement agreement in a patent infringement case. *Id.*, 2020 WL 7767639, at *17 (D. Del. Dec. 4, 2020), *report and recommendation adopted*, 2021 WL 7441706 (D. Del. Mar. 31, 2021). The court in *M2M Sols* did note that "'[c]ourts are generally skeptical of allowing settlement agreements to prove a reasonable royalty'" but it also reasoned "a settlement agreement may properly be considered by a

damages expert 'in its proper context within the hypothetical negotiation framework to ensure that the reasonable royalty reflects the economic demand for the claimed technology.'" *Id.* (quoting *TC Tech. LLC v. Sprint Corp., C.A.* 2019 WL 2515779, at *14 (D. Del. June 18, 2019). Although this language is helpful to the Daoen Defendants here in the sense that it recognizes that information in a settlement agreement can be relevant to a reasonable royalty calculation, the *M2M Sols.* case is not strong authority that the Defendants' broad request for production of all settlement agreements related to Plaintiff's trademarks passes muster under Rule 26(b)(1). And that is particularly true in this case considering that the court in *M2M Sols.* addressed the propriety of an expert's consideration of royalty provisions in settlement agreements while, in this case, neither party will be presenting any expert testimony. *See* Minute Order [ECF No. 158] ("None of these parties has retained experts or made Rule 26(a)(2) expert disclosures so the expert discovery [schedule] the Court set earlier in the case [113] is moot.").

The Court notes further that neither party here addresses whether Plaintiff is, in fact, seeking damages based on a reasonable royalty rate in this case. *See* Motion [ECF No. 161] at 3 (arguing relevance of such agreements because "[t]rademark damages *may* be measured by a royalty . . . ") (emphasis added). *See In re Dealer Mgmt. Sys. Antitrust Litig.*, 2019 WL 3884036, at *2 ("If or when the terms of the CDK/Cox settlement agreement do become relevant to a damage analysis, DCPs can renew their motion seeking disclosure of the settlement agreement based on a more specific or particularized argument than the argument they are now advancing.").

6

While this does not mean that royalty rates are irrelevant to Plaintiff's potential trademark damages, it does weigh against the proportionality of the Daeon Defendant's broad request for all of Plaintiff's settlement agreements.

Nevertheless, *M2M Sols.,* along with other cases cited by the Daeon Defendants about whether licensing terms are relevant to trademark damages, suggest that Plaintiff's settlement agreements related to the asserted trademarks in this case, to the extent they include licensing terms or royalty rates, potentially could be relevant to calculating infringement damages in this case. Indeed, Plaintiff does not dispute that licensing terms could be relevant to its damages calculation. Response [ECF No. 164] at 9 (noting Plaintiff has "already provided Defendants with the pertinent information within the license agreements").

The Daeon Defendants, however, as noted above, are seeking *all* of Plaintiff's settlement agreements related to the asserted trademarks, not only those agreements that contain terms potentially relevant to a royalty calculation, and that request is overbroad. *See Wag Hotels, Inc. v. Wag Labs, Inc.*, 2023 WL 3605977, at *8 (N.D. Cal. May 22, 2023) ("no legitimate basis on which to calculate" reasonably royalty damages in a trademark infringement case based on a settlement agreement that did not contain any royalty provision). The Court could stop here with the Daoen Defendants' unreasonably broad discovery request but, given the history of this litigation, that might not prevent the Daoen Defendants from coming back – first to Plaintiff and then to the Court – with a more limited request for settlement agreements that would pass muster under the legal authority discussed above.

Therefore, given that licensing or royalty terms in Plaintiff's settlement agreements related to the asserted trademarks potentially may be relevant to a damages analysis in this case, and Plaintiff's acknowledgement of the relevance of that information at least as it is contained in licensing agreements, the Court will grant the Daoen Defendants Motion in part and compel Plaintiff to produce its settlement agreements with other defendants in this litigation, but the Court will limit that production to settlement agreements that contain licensing or royalty provisions for the trademarks asserted in this case. Plaintiff's confidentiality concerns can be respected by redacting all other terms in the settlement agreements subject to production other than as necessary for the Daoen Defendants to understand the royalty terms as potentially relevant to a damages calculation for infringement. The Court recognizes that Defendants' request is broader than just the settlement agreements Plaintiff has entered into with other defendants in this case, but under all the circumstances discussed above, the Court finds that the limited and redacted production it is ordering is proportional to the needs of this case.

Turning to the Daeon Defendant's request for production of licensing agreements related to the asserted trademarks, Plaintiff does not appear to dispute the relevance of such information, including royalty rates, as Plaintiff already has produced some of this information in a spreadsheet. Response [ECF No. 164] at 8. Rather, Plaintiff argues production of the underlying licensing agreements is not proportional to the needs of the case because Plaintiff has "already provided Defendants with the pertinent information within the license agreements." [*Id.*] at 9.

The Daeon Defendants say they are entitled to review the full licensing agreements and Plaintiff "cannot select which terms it finds appropriate to disclose and withhold the actual documents." Reply [ECF No. 166] at 3. The Court disagrees. The Daeon Defendants have not articulated how or why any other terms in those licensing agreements beyond the royalty information Plaintiff says it already disclosed are relevant to the claims or defenses in this case. Nor do the Daeon Defendants dispute such royalty information is in the spreadsheet produced by Plaintiff. The Daeon Defendants' position boils down to speculation that there could be other terms of interest in Plaintiff's licensing agreements, but that is not a sufficient basis to compel the production of those agreements. For these reasons, the Court denies the Daeon Defendants' motion to compel production of the underlying license agreements given Plaintiff's production of the relevant royalty terms in those agreements.

## B. Plaintiff's Communications With Amazon Regarding The Daeon Defendants.

The Daoen Defendants initially sought production of Plaintiff's communications with Amazon about the Daeon Defendants, claiming Plaintiff had only "produced a limited subset of such communications." Motion [ECF No. 161] at 4. Plaintiff says that, with the addition of one email attached to its Response, the Daeon Defendants "are in possession of all of the email correspondence between the e-commerce platforms and Plaintiff concerning Defendants." Response [ECF No. 164] at 10. The Daeon Defendants point out that Plaintiff did not produce an Excel spreadsheet that was referenced in the email attached to its Response. Reply [ECF No. 166] at 7; *see* Exhibit A to Response, [ECF No. 164-1]. Plaintiff, however, says it

previously produced the information provided by Amazon in that spreadsheet, including the account number, email address, sales data and account balance for the Daeon Defendants. Response [ECF No. 164] at 10. The Daeon Defendants also say Plaintiff has "not produced any Amazon response" to an email attached as Exhibit G to the Motion, which the Daeon Defendants say shows Plaintiff "instructed Amazon to keep the Daeon Defendants' accused product listing frozen even after the TRO had expired." Motion [ECF No. 161] at 4; Reply [ECF No. 166] at 7.[4]

Based on the record before the Court, there could be additional relevant information in the Excel spreadsheet that was attached to the email Plaintiff produced with its Response but not produced by Plaintiff beyond that which Plaintiff says it already provided. As there is no dispute that this information is relevant and Plaintiff does not contend it would be unduly burdensome or not proportional to the needs of the case to produce the Excel spreadsheet, the Court orders Plaintiff to produce any portions of the Excel spreadsheet referenced in the email attached to Plaintiff's Response that are related to the Daeon Defendants.

The Daeon Defendants also request in Reply that Plaintiff "be ordered to submit a declaration confirming it has done a reasonable search" and "confirm that it has produced *all* communications with any e-commerce platform regarding the Daeon Defendants." Reply [ECF No. 166] at 7 (emphasis in original). The Daeon

---

[4] Plaintiff also argues that Request for Production No. 38 is facially overbroad because it requested "[a]ll documents concerning communications with any sales platform" related to the asserted trademarks. Response [ECF No. 164] at 11. Plaintiff, however, appears to have agreed to produce its communications with sales platforms related to the Daeon Defendants use of the asserted trademarks and Plaintiff does not contend that narrowed request, which is what is sought in the Motion, is overbroad.

Defendants say Plaintiff's representation that it has produced all email correspondence concerning the Daeon Defendants is "disputable" because Plaintiff has not produced the Excel spreadsheet addressed above. *Id.* Plaintiff, however, says that it produced the substance of the information provided by Amazon in that spreadsheet months ago, a point the Daeon Defendants do not directly dispute. Moreover, the Court is ordering Plaintiff to produce the portions of the Excel spreadsheet related to the Daeon Defendants. The Court is not persuaded there is sufficient basis to otherwise question the adequacy of Plaintiff's search for these communications. For that reason, the Court denies the Daeon Defendants' request for a declaration regarding the completeness of Plaintiff's production. To the extent, however, that Plaintiff has in its possession, custody or control any response from Amazon to the email attached as Exhibit G to the Motion ([ECF No. 161-7]), Plaintiff is ordered to produce that response.

### C. Plaintiff's Documents Related To New Alchemy.

Finally, the Daeon Defendants seek all documents related to a company named New Alchemy, which the Daeon Defendants say Plaintiff's CEO testified "is at the heart of [Plaintiff's] 'anti-counterfeiting program'" which "led to this lawsuit." Motion [ECF No. 161] at 5. The Daeon Defendants cite testimony from Plaintiff's CEO that New Alchemy "makes litigation strategy decisions"; "controls settlement"; and "shares in the recovery against each defendant." Motion [ECF No. 161] at 5.

Plaintiff does not dispute the relevance of documents related to New Alchemy's investigation. Indeed, Plaintiff says it relied on information provided by New Alchemy in filing this case and thus it appears to the Court this information is

potentially relevant to the Daoen Defendants' abuse of process counterclaim. Response [ECF No. 164] at 13. Plaintiff instead contends "Counsel's communications with New Alchemy are considered protected communications under the attorney-client privilege." Response [ECF No. 164] at 13. Plaintiff says New Alchemy "assists Plaintiff in the investigation of potential infringement and assists in making litigation strategy decisions and its efforts regarding settlement parameters" and "acts as an Agent for Plaintiff and therefore any communications between Plaintiff and New Alchemy are protected under the attorney-client privilege." [*Id.*] at 12. Plaintiff also suggests documents reflecting "New Alchemy's assistance in this matter" are protected by the work product doctrine. Response [ECF No. 164] at 13.

Accordingly, the issues presented are (1) whether Plaintiff's or Plaintiff's counsel's communications with New Alchemy are privileged, (2) whether New Alchemy's investigation documents and communications are protected work product, and (3) whether Defendants' request for production of all documents related to New Alchemy is proportional to the needs of this case within the meaning of Federal Rule of Civil Procedure 26(b)(1). As a threshold matter, a party claiming that otherwise discoverable information is privileged must "expressly make the claim," and "describe the nature of the documents, communications, or tangible things ... in a manner ... that will enable other parties to assess the claim." FED. R. CIV. P. 26(b)(5)(A). The burden rests upon the party objecting to disclosure to show why the information is privileged and should not be produced. *See United States v. BDO Seidman*, 337 F.3d

802, 811 (7th Cir. 2003); *Kodish v. Oakbrook Terrace Fire Prot. Dist.*, 235 F.R.D. 447, 450 (N.D. Ill. 2006).

The Daeon Defendants argue Plaintiff's "broad brush" privilege claims are insufficient to establish privilege over all documents and communications related to New Alchemy. Reply [ECF No. 166] at 5-6. The Court agrees. The Daeon Defendants correctly point out that while Plaintiff argues New Alchemy is acting as its agent, Response [ECF No. 164] at 11-12, there is no "'agent-client" privilege" for communications between Plaintiff and New Alchemy that do not involve an attorney. Reply [ECF No. 166] at 4. The Court agrees that Plaintiff's characterization of New Alchemy as its agent, without more, is an insufficient basis to establish that all of Plaintiff's communications with New Alchemy are privileged attorney client communications.

As to whether Plaintiff's counsel's communications with New Alchemy are privileged, Plaintiff says that where a third party is present or involved in attorney-client communications, there is no waiver of privilege "when that third party is present to assist the attorney in rendering legal advice" and the "involvement of the third party must be 'nearly indispensable' or 'serve some specialized purpose in facilitating the attorney-client communications." [ECF No. 164] at 12 (quoting *Breuder v. Bd. of Trustees of Cmty. Coll. Dist. No. 502*, 2021 WL 4283464, at *3–4 (N.D. Ill. Sept. 21, 2021). Plaintiff says New Alchemy fits into this category because its "investigation of potential infringers and the collecting of infringing evidence" as to the various defendants in this lawsuit "as well as their input in the litigation

strategy and settlement parameters is critical to Plaintiff's case." Response [ECF No. 164] at 13. Plaintiff asserts "New Alchemy's efforts involved rendering advice critical to facilitating and improving Counsel's comprehension of the facts of the present case" including because "Plaintiff's Counsel did not search the e-commerce platforms . . . to locate potential infringers of Plaintiff's" trademarks "but rather relied upon the expertise of New Alchemy to do so." [*Id.*] Plaintiff also says that "Plaintiff's Counsel relied upon New Alchemy's advice to assist with various defendants in its settlement efforts in this matter." [*Id.*] For all these reasons, Plaintiff says "New Alchemy's advice and efforts are an indispensable part of Counsel's efforts in searching for potential infringers, making legal determinations and resolving disputes between defendants." [*Id.*] For that reason, Plaintiff says its counsel's communications with New Alchemy are privileged.

Plaintiff, however, has done little to support its privilege argument other than to assert didactically that the documents the Daoen Defendants request are covered by the attorney client privilege. Plaintiff, for example, has not produced a privilege log of ostensibly privileged communications between itself or its counsel and New Alchemy that would show the nature of the communications between counsel and New Alchemy, the people involved or their capacity, or when those communications occurred. Plaintiff cites to nothing other than its broad legal conclusions that all documents relating to New Alchemy are privileged, with no evidentiary support whatsoever for these statements.

Moreover, Plaintiff's description of its relationship with New Alchemy in its brief that it says give rise to its privilege claim and the testimony of Plaintiff's CEO and corporate representative witness about that subject is not entirely consistent. Plaintiff's CEO testified that New Alchemy submits reports of potential infringing uses of Plaintiff's trademarks to a non-attorney employee of Plaintiff and this non-attorney reviews the results to identify which potential uses New Alchemy should further investigate but does not make legal determinations about those identified uses. Exhibit H to Motion [ECF No. 161-8] at 57-63. Plaintiff's CEO also testified that after this initial review, "New Alchemy takes it and goes from there" and "[a]s far as I know, they contact the attorneys." [*Id.*] at 61.

Plaintiff's CEO did not know whether any other attorney for Plaintiff analyzed each defendant's potential infringement before a lawsuit like the current litigation is filed. [*Id.*] at 64-65. She testified Plaintiff had a general agreement with New Alchemy as to the filing of *ex parte* motions for temporary restraining orders in these cases, but she was not consulted about the decision to file such a motion in this case. [*Id.*] at 148-151. In her declaration filed in support of the TRO motion, she stated "[w]e perform, supervise and/or direct investigations related to Internet-based infringement of the BIGFOOT Trademarks" and "[w]e, or someone working under our direction, analyzed each of the Defendant Internet Stores and determined that Counterfeit BIGFOOT Products were being offered for sale to the United States, including Illinois." Trent Declaration, [ECF No. 11-1] at para. 10. Plaintiff's CEO also testified at her deposition that New Alchemy handled settlements with defendants,

settlement payments were made directly to New Alchemy, and Plaintiff received a percentage of what New Alchemy collected. [*Id.*] at 121-126. Based on this record, the extent to which Plaintiff's counsel makes litigation decisions based on information provided by New Alchemy, as Plaintiff's conclusory argument goes, is far from clear.

As the Daeon Defendants also note, Plaintiff's CEO identified categories of documents, including investigation reports from New Alchemy, which Defendants are requesting that do not appear to involve any communications with counsel. Reply [ECF No. 166] at 5. Plaintiff suggests such documents are protected by the work product doctrine. Response [ECF No. 164] at 13. Courts have reached different conclusions regarding whether the work product doctrine protects investigation reports of companies providing trademark investigation services generated through a process that appears to be similar in some respects to New Alchemy's role in this case (although the parties here do not address these decisions in their briefing).

In *Volkswagon AG v. Dorling Kindersley Pub., Inc.*, 2007 WL 188087, at *2–4 (E.D. Mich. Jan. 22, 2007), the court considered whether documents prepared by a third-party company, Continental, which "is in the business of investigating possible instances of trademark infringement" were protected work product. In that case, the plaintiffs argued "Continental does the 'initial work in collecting . . . evidence and sending out cease-and-desist letters. If the matter isn't resolved, it's typically referred to an outside law firm . . .'" and the plaintiffs argued "Continental has assisted Plaintiffs in resolving hundreds, if not thousands, of trademark infringement matters." *Id.*, 2007 WL 188087, at *2–4. The court concluded "some cases on which

Continental collects evidence are resolved without the involvement of a law firm and ensuing litigation. In this way Continental is similar to an insurance company which produces reports which may or may not later be used in litigation" and determined "the question is whether Continental's documents were prepared when Plaintiffs had an objectively reasonable subjective belief that litigation was a real possibility." *Id.* The Court then found that the plaintiffs in that case failed to show "that litigation was a real possibility at the time" the document was prepared where letters were written three years before the subject trademark litigation was filed. *Id.*

Another court, however, explained that the same trademark investigation company, Continental, "'is an intellectual property enforcement and investigation firm, which assists companies and their counsel in finding and prohibiting unauthorized use of their intellectual property,'" and concluded that where "Continental contracted with [plaintiff and plaintiff's outside counsel] to provide the above services" and "privilege logs indicate, documents that involve Continental are related to settlement, the alleged violation of the settlement agreement, and other related litigation matters," documents related to Continental were privileged attorney client communications or protected work product. *See Heckler & Koch, Inc. v. German Sport Guns GmbH*, 2012 WL 13029391, at *2–3 (S.D. Ind. Dec. 28, 2012), *clarified on denial of reconsideration*, 2013 WL 2406262 (S.D. Ind. May 31, 2013) (internal citations omitted). The court in *Heckler & Koch* distinguished *Volkswagon*, noting "Continental's current in-house counsel" was "also counsel of record" in *Heckler & Koch*, and that "the documents in *Volkswagon* were created several years

before any litigation commenced and were related to a routine intellectual property infringement investigation," while in *Heckler & Koch*, "the subject matter of the documents . . . relates directly to litigation and the time period in which they were created demonstrates that they were created in anticipation or because of litigation." *Id.*

While the outcomes of these two decisions differ, both courts closely analyzed the relationship between the trademark investigation company and the party's counsel based on evidence submitted by the trademark owner to determine whether the investigation company's work was in anticipation of litigation or whether its communications with the party's counsel were privileged. Cases are decided on their facts and the applicable law. Here, Plaintiff has submitted no factual support for its conclusory arguments about the nature of its and its counsel's relationship with New Alchemy that permit the Court to make a determination about the nature of that relationship and whether communications in that context are privileged. Unlike in *Heckler & Koch*, "New Alchemy is not an attorney or law firm" and New Alchemy has no appearance of record in this litigation. Reply [ECF No. 166] at 4. The Court does not know whether Plaintiff's counsel was involved in the retention of New Alchemy to perform investigations relevant to this case, whether those investigations were done in anticipation of litigation or in the regular course of business, or the nature of Plaintiff's counsel's involvement, if any, in supervising New Alchemy's investigations or settlement negotiations.

Given Plaintiff's failure to provide factual support for its privilege and work product claims, and, indeed, its failure to cite any specific documents or communications in support of these claims, the Court cannot find that New Alchemy's communications with Plaintiff's counsel (or more generally with Plaintiff) are covered by any privilege that weighs against their production. For instance, and among other issues, Plaintiff has not explained why communications between a non-attorney employee of Plaintiff (as described by Plaintiff's CEO) who is not making legal determinations and New Alchemy would be protected attorney-client communications. It is also unclear how agreements between Plaintiff and New Alchemy would be privileged communications or work product. *See* Reply [ECF No. 166] at 3. There is simply no support in the record for Plaintiff's broad attorney client privilege and work product doctrine claims other than Plaintiff's say-so.

"Simply asserting the argument that the third-party advisors and consultants were integral to the in-house lawyers' rendering legal advice is not enough. It must be clear from the actual communications that the lawyer was seeking input and/or advice from the third-party advisors and consultants in order to provide legal advice rather than asking the third-party advisors and consultants to offer their independent assistance, assessment, and opinion separate and apart from the legal advice." *See In re Dealer Mgmt. Sys. Antitrust Litig.*, 2020 WL 7866172, at *3 (N.D. Ill. Mar. 4, 2020). Plaintiff has submitted no information that would allow the Court to make these kinds of determinations. Nor can the Court assess whether New Alchemy's trademark investigation reports were created in anticipation of litigation

or if the reports are routine trademark monitoring conducted in the ordinary course of business. Plaintiff's blanket assertion of attorney-client privilege over all communications between Plaintiff's counsel and New Alchemy and work product over all documents prepared by New Alchemy is insufficient to meet Plaintiff's burden under Rule 26(b)(5)(A).

In addition, Plaintiff has not been consistent in asserting privilege as it relates to New Alchemy. The Daeon Defendants requested documents related to New Alchemy's investigations and its communications with Plaintiff during and after Plaintiff's CEO's deposition, Motion [ECF No. 161] at 5, but it does not appear that Plaintiff asserted privilege over these documents during the deposition or the discovery process. Nor did Plaintiff produce a privilege log of the New Alchemy documents in discovery or in response to this Motion. "[T]he failure to provide a proper privilege log may result in waiver of any asserted privilege," a finding that would also be appropriate here. *See Schaeffer v. City of Chicago*, 2020 WL 7395217, at *3 (N.D. Ill. Dec. 15, 2020).

In these circumstances, like in other cases, "[t]he Court has no way to determine whether the protection [Plaintiff] seek[s] is appropriate, which is [Plaintiff's] burden as the party asserting work product protection." *See Rao v. Bd. of Trustees of the Univ. of Illinois*, 2016 WL 6124436, at *6 (N.D. Ill. Oct. 20, 2016) (rejecting work product claim for investigation files where court was not "provided with any evidence regarding the contents of the investigative files; Defendants have not produced a single affidavit, an engagement letter, or even a general description

of the documents that they seek to protect" concluding "Defendants have simply not provided either the Plaintiff or the Court with any of the information necessary to make an informed decision on whether the contents of the investigative files should be withheld from discovery. Instead, Defendant waited until the eve of the close of the discovery to make a claim of privilege over the entirety of two investigative files that have not been described in anything but the broadest possible terms."). *See also BDO Seidman*, 337 F.3d at 811 ("The mere assertion of a privilege is not enough; instead, a party that seeks to invoke the attorney-client privilege has the burden of establishing all of its essential elements."). The courts' comments in these cases are equally applicable here with respect to Plaintiff's failure to meet its burden.

For all these reasons, the Court finds that Plaintiff has failed to meet its burden to establish that the attorney client privilege or work product protection applies to all New Alchemy communications and documents. Therefore, the Court finds that neither the attorney client privilege nor the work product doctrine block Defendants from obtaining from Plaintiff, pursuant to a properly framed discovery request, documents related to New Alchemy.

The Court, however, must also assess whether the Daeon Defendants' request for "all documents related to New Alchemy" is proportional to the needs of the case. FED. R. CIV. P. 26(b)(1). The Daeon Defendants say this request is derivative of (or arguably included within) their broad Request for Production No. 3 ("RFP No. 3"), which sought "[a]ll Documents concerning the circumstances surrounding Plaintiff's actual discovery of the facts alleged in the complaint." Motion [ECF No. 161] at 5. The

Daeon Defendants also assert documents related to New Alchemy are relevant to "the adequacy of [Plaintiff's] pre-suit investigation and the Daeon Defendants abuse of process counterclaim" in this case. [*Id.*] at 1.[5]

Plaintiff did not object to RFP No. 3 as originally framed, nor did it object to the scope of the Daeon Defendants' reframing of RFP No. 3 to focus on New Alchemy documents. *See* Plaintiff's Second Amended Responses to the First Set of Requests for Production by Defendant No. 99 "HobbyPark-US" [ECF No. 161-1]; Response [ECF No. 164] at 11-14. In their Reply, the Daeon Defendants specify further the documents related to New Alchemy that they now are seeking, identifying categories of documents such as agreements between Plaintiff and New Alchemy, weekly reports with the results of New Alchemy's investigations, and monthly reports with financial information including as to settlements with defendants. [ECF No. 166] at 3-7.

The Daoen Defendants made their request for the New Alchemy documents late in the discovery process. That may stem in large part from Plaintiff's delay in responding to discovery earlier in the case. The Daeon Defendants had to file a motion to compel Plaintiff to respond to their discovery requests which the Court granted on August 15, 2023 [ECF No. 123]. And while Plaintiff eventually produced documents

---

[5] During the parties' meet and confer efforts, the Daeon Defendants asserted that documents related to New Alchemy were responsive to many of their requests for production in addition to RFP No. 3, *see* Daeon Defendants' Status Report [ECF No. 149] at 3, but in the Motion, the Daeon Defendants argue only that documents related to New Alchemy are responsive to RFP No. 3. *See* Motion [ECF No. 161] at 5. Based on the Court's review, the Daeon Defendants' other requests for production did not include specific requests for documents related to New Alchemy's role in this litigation, although they broadly seek to discover information about the extent of Plaintiff's pre-suit investigation of trademark infringement more generally. *See* Ex. A to Motion [ECF No. 161-1].

on August 31, 2023 [ECF No. 136], on the eve of the then-existing discovery close date of September 1, 2023 [ECF No. 113], Plaintiff's CEO was not deposed until October 18, 2023, just over two weeks before the extended fact discovery close date of October 31, 2023 [ECF No. 137]. According to the Daeon Defendants, it was only when Plaintiff's CEO was deposed that they learned of New Alchemy's role in this litigation, and the Daeon Defendants promptly requested that Plaintiff produce documents related to New Alchemy during and after that deposition. *See* Ex. D to Motion [ECF No. 161-4]; *see also* Daeon Defendants' Status Report [ECF No. 149] at 3. At that point in the litigation, the Daoen Defendants could not serve additional discovery targeting New Alchemy. So, they were left with re-framing their overbroad RFP No. 3 to focus on New Alchemy. When Plaintiff failed to produce any New Alchemy documents, the Daeon Defendants brought this Motion.

The Daeon Defendants have essentially re-framed RFP No. 3 to focus on documents related to New Alchemy including the more specific categories identified in their Reply (*e.g.*, agreements between New Alchemy and Plaintiff, and communications between New Alchemy and Plaintiff such as weekly and monthly reports). The Court assumes the Daeon Defendants would further limit their request for weekly and monthly reports to those documents that relate to the Daeon Defendants. While this "blue penciling" of RFP No. 3 after the close of fact discovery may not be the best practice in most cases, it is understandable in the context of this case given Plaintiff's delay in responding to the Daoen Defendants' discovery requests and it is sufficient to render the modified request proportional to the needs of this

case, particularly as Plaintiff did not object to the Daoen Defendants reframing RFP No. 3 in this way. Therefore, the Motion is granted but only with respect to the narrower category of documents that the Daoen Defendants now say they are seeking: agreements between New Alchemy and Plaintiff, and communications between New Alchemy and Plaintiff such as weekly and monthly reports. The Daoen Defendants do not articulate how their request for documents related to New Alchemy's investigations undertaken for Plaintiff in other cases or about unrelated trademark disputes is relevant or proportional to the needs of this case. Therefore, the Daoen Defendants' Motion is denied to the extent Defendants ask the Court to compel Plaintiff to produce this broader category of documents, and in all other respects.

### D. The Daeon Defendants' Request for Reasonable Expenses.

The Daeon Defendants also request an award of their fees and expenses in bringing this Motion. Motion [ECF No. 161] at 1-2, 6. Pursuant to Federal Rule of Civil Procedure 37(a)(5)(C), a court has discretion in apportioning fees where a motion to compel discovery is granted in part and denied in part, as is the case here. FED. R. CIV. P. 37(a)(5)(C); *Alicea v. Cnty. of Cook*, 88 F.4th 1209, 1219 (7th Cir. 2023) ("Rule 37(a)(5)(C) provides that if a motion to compel is partially granted, the district court has discretion to, 'after giving an opportunity to be heard, apportion the reasonable expenses for the motion.'"). In determining the proper apportionment of expenses, or whether to apportion expenses at all, "the court will look to the relative degree of success of the party seeking fees." *Belcastro v. United Airlines, Inc.*, 2020 WL 1248343, at *4 (N.D. Ill. Mar. 15, 2020) (internal citation omitted).

The Court has denied the Daeon Defendant's Motion in part as to their overbroad request for all settlement and licensing agreements, ordering production of a much more limited set of documents than requested and they only narrowly prevailed on their request for Plaintiff's communications with Amazon, obtaining an order that Plaintiff produce one spreadsheet that was referenced in a single email that Plaintiff attached to its Response. As to the New Alchemy documents, the Daeon Defendants' request again was overbroad and was granted only in part because Defendants substantially modified or reframed their original broad request for production and subject to the additional proportionality limitations imposed by the Court.

Under these circumstances, the Court, in its discretion, finds that an award of attorneys' fees and expenses incurred by the Daeon Defendants in bringing this Motion is not warranted under Rule 37(a)(5)(A)(iii).

## II.    Conclusion

For all the above reasons, the Court grants in part and denies in part Defendants Shenzhen Daeon Model Technology Co., Ltd., Shenzhen Aoxinfa Technology Co., Ltd., and Shenzhen Tianqinli Technology Co., Ltd. Opposed Motion to Compel Production of Documents and Award Fees and Costs [ECF No. 160]. The Court grants in part the Daeon Defendants' motion to compel production of Plaintiff's settlement agreements with other defendants in this litigation that contain licensing or royalty terms related to the asserted trademarks with the redaction of all other provisions in those agreements other than as necessary for the Daoen Defendants to

25

understand the royalty terms. The Court denies the Daeon Defendants' motion to compel production of any other settlement agreements and licensing agreements. The Court grants the Daeon Defendants' motion to compel any portions of the Excel spreadsheet referenced in the email attached as Exhibit A to Plaintiff's Response [ECF No. 164-1] related to the Daeon Defendants, and any response from Amazon to the email attached as Exhibit G to the Motion [ECF No. 161-7]) in Plaintiff's possession, custody or control. The Court grants in part the Daeon Defendants' motion to compel production of documents related to New Alchemy, but limited to agreements between Plaintiff and New Alchemy, and communications between Plaintiff and New Alchemy related to New Alchemy's investigation of the Daoen Defendants for the instant litigation, including in weekly and monthly reports to Plaintiff. The Court denies the Daeon Defendants' request for their reasonable attorneys' fees and expenses related to bringing this Motion.

It is so ordered.

Jeffrey T. Gilbert
United States Magistrate Judge

Dated: June 25, 2024